Paul Lindenmuth particularly as it relates to a First Amendment public employment claim wherein it is claimed that there is retaliation for a speech that was concededly protected by the First Amendment. This is a factual sufficiency issue in a case where the primary issue is a motivational inquiry. Since we are dealing with a motivational inquiry, what should have been examined by the district court are issues such as circumstantial indicia of discriminatory or retaliatory intent. When we look at such issues, of course, we look at things such as timing, pretext, credibility, motive for reprisal, interrelationships of the parties, and interim harassment to maintain causal links between protected activity and retaliatory conduct. In preparing today in dealing with the issues of causation presented by this appeal, I began developing a chronology. And in developing the chronology, you do so with the idea that I'll present this to the court and have an understanding of the facts. But in examining the chronology of this case, and one looks at the circumstantial surrounding Mr. Knudsen's employment and ultimately his termination from employment, the chronology itself speaks volumes as to what occurred in this case. What we do know, and it's undisputed, that in the year 2001, the city of Tacoma was recruiting a police chief. Mr. Knudsen was the human resources director for the city of Tacoma. His chief subordinate was a woman named Mary Brown who was tasked with the job of putting together a recruitment effort for the police chief position. Due to some various machinations, David Brame, who had been working for the city of Tacoma in the police department, managed to make the final list of selectees. According to Mr. Knudsen's testimony in his deposition in the Brame wrongful death suit, Mr. Brame had run an artful campaign politically to place himself in the position of becoming a candidate for police chief, and ultimately becoming the police chief of the city of Tacoma. At the time the selection process was being finalized, Mr. Knudsen, as well as his chief subordinate, Ms. Brown, warned the selecting official, who was at that time city manager Ray Corpus, against hiring David Brame because of problems with his recommendations, as well as, as I recall Mr. Knudsen indicating in his testimony, that because of his artful campaign to get the job, Chief Brame, soon to be Chief Brame, would be outside the control of the city manager's office. He was selected as the police chief, anointed by the city council as their selectee and their designated favorite son. The HR department, according to Mr. Knudsen at that point, was closed out of the affairs of the police department of the city of Tacoma. Now we have to fast forward to February 2003 when David Brame's wife filed for dissolution. Within the divorce file there was a number of allegations that could be characterized as allegations of misconduct against a highly placed public official. On April 22, 2003, an internet publication known as the New Tacoma began disclosing the allegations within the divorce file. On April 25, 2003, the Seattle Post-Intelligencer ran a long article discussing the contents of the divorce file, the various allegations of what could be characterized as sexual misconduct, inappropriate gunplay involving Chief Brame's service revolver directed towards his spouse. The public officials in the course of the newspaper articles generated at that time were distancing themselves from the controversy by indicating that this was a civil matter or it was simply a personal matter. Concerned by the allegations, particularly as it related to gunplay, Mr. Knudsen, the human resources director for the city of Tacoma, and his sons are police officers, so he has an understanding of what should be done with police officers in circumstances where such allegations are made. Mr. Knudsen gravely concerned about such allegations called an impromptu meeting with the city attorney for the city of Tacoma, initially the chief deputy named Elizabeth Pauley, and later the sitting city attorney, Robin Jenkinson. That meeting, which occurred in the afternoon of April 25, probably has become the most controversial conversation that ever occurred within the city of Tacoma. Ultimately, the existence of this conversation became embroiled in the wrongful death suit brought by the children of David Brame, which will be discussed in a moment, which ended up resulting in a $12 million settlement paid out by the city of Tacoma to the children of David Brame. And as we know, the next day following this conversation, which content became controversial, the next day the local newspaper in Tacoma ran an article demanding an investigation of David Brame. Within hours, David Brame in Gig Harbor, Washington, met up with his wife during a transfer, I believe a transfer of their children during a visitation issue, and murdered her with a service revolver and took that gun and shot himself in the head. Murder, suicide. All of this is laid out in the briefs. It's a terribly unfortunate event. Let me see if you can help me with my focus on the case. These events occurred in, unfortunate events occurred in April of 03, right? Correct. In September of 03, a human relations employee named Alila Fish complained about some improprieties, alleged improprieties on Mr. Knudson's part. Is that correct? I believe that is correct. Did Ms. Fish have any connection to these prior events? Ms. Fish had a connection to the human resources department. I believe the events that she was complaining about occurred were very well-seasoned events, and ultimately those investigations My question was, was she tied up with this, quote, conspiracy or whatever that had occurred leading up to this unfortunate loss of life? No, and I don't think we can see, I don't think it's really a disputed fact. She had made the complaint. And it's correct, isn't it, that the city hired outside counsel to investigate this? Correct. And what did they conclude? I think they ultimately concluded that there was no rule violation, but there had been a manipulation of the process. And Mr. Knudson had certainly taken the position that that was the so-called manipulation of the process, was him simply exercising his discretion as the human resources director with the City of Tacoma. Okay. Then in February of 04, the city manager learns that, or here's another allegation, a separate allegation that Mr. Knudson had allegedly improperly intervened in a hiring or personnel matter. Is that correct? You know, if you want to characterize it at best, it was a conversation that could have been viewed as being an attempt to influence a hiring decision with a person that hadn't yet even agreed to be part of the hiring decision. And it was certainly something that I think Mr. Knudson regretted and indicated, in fact, he shouldn't have done. But you have to look at the big picture here. Those facts did occur, but if you take them out of context like anything else, they become more important than they are. I'm leading to a sort of penultimate question here, and I hope you can help, because I truly have not made up my mind about this case. Would you agree that standing alone, if all of these other unfortunate events had occurred, that these two events would have been acceptable to Mr. Knudson's supervisor to consider in whether to continue his employment? You know, he was – I think technically he was an employee at will. It could have been a bad tie. Okay. You know, it –  Now, here's where you can help me. Okay. Tell me why – and again, in this second instance, was there outside counsel again retained? I think there was some kind of investigation, Dan. You know, the thing about it is I – Tell me why these two events should not be viewed in isolation and how they're tied to the series of unfortunate events that you already described. Thank you. And I think that is the rub. And the reason why you can't take it outside of isolation, because you remember the decision-making official is Mr. Walton. And it's very clear, according to Mr. Knudson's interrogatory answers and his notes that were incorporated therein, you've got this grisly public controversy about this April 25th meeting. And what's Mr. Walton's response to it? He drags Mr. Knudson into what I characterize as a number of bizarre meetings where he's being directed to basically change his story. I mean, that's how you characterize it. I mean, that's our characterization. He's being directed to change his story. He's being directed to – Is Walton the person who's asking him to change his story? Yes. Okay. Walton is his direct supervisor. Walton is also the person who came in. He's the city manager. Immediately after this meeting and the murder-suicide, he was trying to get Mr. Knudson to change his story. Once the public controversy with respect to the April 25th meeting occurred, there was a delay there. Mary Brown had leaked the story on May 2nd. The news media picked up on the existence of this meeting on May 3rd. There was this issue about a waiver of attorney-client privilege that delayed the story being developed in the news media. On May 31, you have these – by May 28th, you have a press release by the city attorney. Then on May 30th, you have a press release by the HR people. Mary Brown consistently supported Mr. Knudson about the content of the April meeting, correct? She did, and they didn't like that. And also, we actually – Isn't it also true that Ms. Brown was critical of Mr. Knudson about one of these later events? Sure. But, you know, she's an opinion – a person who is entitled to her opinion. Ultimately, it was Mr. Knudson's decision with respect to change the past point when he came up with a testing process that was inherently flawed in his opinion. But it's kind of hard to cast her as part of any conspiracy, isn't it? Oh, no. I think if anybody, she would have been a target of the conspiracy, as well as Mr. Knudson. It's very clear they took sides as to who was right and who was wrong, even though they did no investigation. If they had done an investigation, they would have found Mr. Marcotte, another highly-placed official, that would have said, look, right before this conversation occurred, I was talking to Mr. Knudson, and Mr. Knudson was indicating that they ought to take his badge and gun away. Then you have the conversation later in the day. They didn't want to hear that. They didn't want to investigate it. They just wanted to point fingers and fill, call him a liar publicly in the news media because they didn't like what he had to say. So the wrongful death suit by the brain children, with all of this controversy came out during that. Yes. That's why we have the evidence that we have. Some. Not all. Some. And there's also investigations occurring. Once this thing blew up, I mean, my goodness, the city of Tacoma had their police chief kill his wife and himself. There's a multiplicity of investigations into what went wrong here. So I don't want to speak for Judge Hawkins, but I think it's similar. I'm trying to figure out, it seems as though the termination wasn't solely motivated by this. So your best case is that it's mixed motives. So the timing of the events and, you know, was this simultaneously going on? Could this be built? Do you see what I'm trying to say? I'm trying to figure out all of this. Yes, and I thank you. And I thank you for pulling me back to his question because I wasn't complete in my response. Yes, because we have these other things occurring. I mean, if we look back, the controversy really blew up in late May, June. By June 2nd, Mr. Walton's calling Mr. Knutson into private meetings, putting pressure on him to change his story, get control of Mary Brown, et cetera, et cetera. During that process, he had just given a statement, not under oath, but a statement to the Washington State Patrol in one of their investigations, which outlined this very same material. So he's participating in an official investigation at the same time. They're trying to make him change his story. Now, at that point in time, it doesn't stop. You know, you've got the summertime, but as soon as you get out of the summertime, they're banning him from executive sessions when he's not allowed to do his job, which is to put on presentations to the city council. We start peeling that onion back. Well, why are you banning him from executive sessions? Well, we think he's a leak. Okay, what do you think he's a leak about? Well, they talk about various other things, but they also viewed him as being the leak of the April 25th story. So they think he's unreliable because that story made it into the media. So they're retaliating against him that way as late as October of 2003. Then we have as late as October, I believe, 30th or 31st, 2003, once again Mr. Walton's calling him into the office and having what Mr. Knudson calls this disjointed conversation about diversity issues. You know, before I had told him that these council people were out to get him. The mayor knows the council people are out to get him. So there's other things going on here and other sources. Mayor Barsma on October 7th says, Phelps and McGavock are out to get you when he meets with him. He's being barred by county council meetings on the 9th of October. On October 31, he's having a conversation where, once again, Walton goes back to this issue about the April 25th meeting. So, okay, we've got passage of time. We've got interim harassment being barred from meetings. You've got harassments, again, about just taking a position. Now, we've got, we're all the way up to really November. And then in February, and still there's even more things going on. In January 12th, 04, you're getting a strange letter saying, If you don't subjectively believe in our position, we won't indemnify you from the city's lawyers. You have a meeting, or there's an internal affairs interview occurring on January 22nd, 04, where, once again, an official investigation is going through these facts. Then on February 12th, he's doing another interview. And then all the way on February 26th, despite the allegations of this coming up in September, he's being put out on suspension. Now, that's the point where you stop from the causal link analysis. Because in the interim, then they're working through the investigative process. May, he's fired, or gives notice in June, he's fired. You can't separate all these events. You can't take them in isolation. The question is, could they have fired him for these events? Yes. But what the jury needs to sort out is, would they have? They could have fired him for anything. But would they have? You try to present other evidence of disparate treatment. You have somebody committing unethical violations of the city of Tacoma by having a conflict of interest. Very serious violation. And what does he get? He gets a written reprimand. Did you think that was a comparable violation? I think it was. I think when it comes to the Lila Fish matter, they indicated that he had best violated the spirit of a rule. When it came to the Crillo matter, at best, it was an attempt to influence that got absolutely nowhere under circumstances where, one, you have to understand the enormous pressure Mr. Knutson must have been under, given the stress and strain of this scrutiny. Two, one thing that was ignored in that entire investigation, which was inherently flawed, was the fact the only reason he went and approached this gentleman is because Councilman Talbert had violated their own rules and was trying to influence to hire his buddy. Now, under counsel rules, Mr. Talbert should have been subject to some form of censure for that. They didn't even ask Mr. Talbert what had happened in the part of this investigation. Can you consider those kind of things, looking at the flawed investigation when determining whether there's pretext? Of course you can. Again, look, the defense has a defense in this case. We concede that they have some things to say. But we're here on a review of a summary judgment motion. We have to view the facts in the light most favorable to the plaintiff. And the question isn't whether or not the defense has a potential defense that they may win on at the end of the day. The question is, is whether we get to present our claim to a jury. Okay. Counsel, you are three minutes over your time. It's a very factually rich case, obviously. Thank you. Good morning. May it please the Court, Gene Homan here on behalf of the defendants' appellees. This is a dismissal on summary judgment in which this Court reviews in de novo. And the very first step in that process is to look at what was proffered to both the district court and to you and to decide what's admissible. Summary judgment can be defeated. Did you make these arguments to the district court? Yes. And did the district court rule on whether the evidence was admissible or not? The district court did not rule one way or the other. And we preserved the issues to present at appeal. How did you do that? Excuse me? How did you do that? I mean, how did you preserve it? If you made an objection, but the district court didn't rule on any of this. We made a formal motion to strike. No order was entered. I know plaintiffs have made the argument that we should have cross-appealed. There was no order from which to cross-appeal. And the case law, for example, Frazier v. Goodall, says that making the evidentiary objection at the district court level is sufficient to preserve the error. Plaintiff cites to Frazier v. Goodall in a way that I think is very important for the Court. They make the argument that they can cure their evidentiary deficiencies at trial and that the Court shouldn't elevate form over substance. In fact, the reverse is true. The materials to which the plaintiff cites in support of most of these allegations are materials that are hearsay, that hearsay defect cannot be cured because, unfortunately, Mr. Knutson passed away. There will be no live testimony from Mr. Knutson with respect to any of these allegations. The city did not offer his interrogatories or his handwritten notes or his letters or his WSP interviews. Now, that was not the ground on which the district court granted some of the judgments, though. No. But as they did at the district court level, today the plaintiffs have argued to you a number of things in their chronology of events that they claim occurred. They can only base those claims on inadmissible evidence. And so in assessing the district court's denial or grant of summary judgment, the court must ignore what was not admissible, as the district court did. He may not have formally ruled, but he didn't rely on inadmissible evidence in his ruling, in its ruling. What is at issue here, and the parties do agree on this, is whether there's sufficient evidence of causation as to Mr. Walton's motive. And as the Court correctly noted, there were a lot of intervening things that occurred upon which Mr. Walton based his opinion. In September of 2003, well, let's back up just a little bit. You did have the Brame shooting. There's no question that there was a tremendous amount of media exposure on the April 25, 2003 meeting in what was allegedly said and not said. And really, this isn't about what was actually said during the meeting. This is about whether or not that speech, Mr. Knutson's comments to the newspaper, were a motivating factor in Mr. Walton's decision to terminate his employment. And there is absolutely no evidence, no competent admissible evidence to make that connection. Mr. Walton was appointed interim city manager in May. He was appointed permanently in July. He was in a position, as there is testimony in the record, at that point in time to say, you know what, I'd want a different management team, and change his directors then. He didn't do so. He specifically testified, as is contained in the record, that he hadn't given up on Mr. Knutson as human resources director. He outlined his expectations, and he expected Mr. Knutson, as well as all of his other directors, to rise to meet them. Your understanding is that Mr. Knutson was an employee at will with respect to Mr. Walton? Yes. So that he could have been fired for any reason or no reason? Exactly. Suppose he'd been fired for no reason? He can be fired for no reason. He can't be fired for a discriminatory or retaliatory reason. I think you misinterpreted the question. Okay. I'm sorry. Suppose that these two instances weren't in – moved them hypothetically off the plate. Okay. Could Walton have fired him and Knutson and say, I'm firing you, and I have no reason? Yes. He could have. And had he done so, do you think summary judgment would have been appropriate here? Actually, probably not. I think absent the intervening events, the Court probably would have been correct in denying summary judgment and finding a material question of fact. Causation can be established by a couple of different things. Everybody agrees there's no direct evidence of a misjudgment. You know, it's really odd to me in this case is that if Walton could have fired Knutson for no reason at all, why did he use these two reasons of conduct that – for which Mr. Knutson was ultimately vindicated as reasons to fire him? If he didn't need any reasons, why did he come up with these, which don't seem to be – I mean, that – May I ask for clarification? You said on which Mr. Knutson was ultimately vindicated. Well, he was – they weren't found to be clear violations of anything, either  I would respectfully disagree with the Court. Mr. Knutson was investigated for two separate acts of misconduct. One was changing the passpoint on a – That leads me to another question, which is, how can summary judgment be granted when there's so many disputed issues of fact? Under the standard articulated by the Supreme Court in Selah text, the defendant can meet its burden on summary judgment by pointing out the absence of evidence on any essential element of the plaintiff's prima facie case. That is the basis upon which the defendants moved in this matter. There is an absence of evidence to establish causation. And the district court agreed with that analysis and found that the plaintiff could not and had not proffered sufficient evidence to establish a prima facie case that the decision to terminate his employment was motivated in part by any of the protected speech that he had given. The timing of these is gone. Go ahead. Now, please, Judge, why not? Go ahead. Well, I've asked enough questions. Go ahead. But no secret that Walton took the position that Brown and Knutson were wrong about the April meeting preceding the murder-suicide, right? I don't know if I would say that they were wrong. As Mr. Walton – Well, let me restate another way. There is no question that Walton took the position that the people, the mayor, et cetera, whoever was at that meeting, who denied that Knutson and Brown had said you need to put this guy in administrative leave and take his weapon away, that Walton believed the people who said that never happened. I don't know that there's actually testimony in the record to that effect. What Mr. Walton testified to was when it was leaked to the media, I didn't care who leaked it. The story is out there. It's on the front page. It's been – It turned out that Mrs. – that Mary Brown leaked it, right? Correct. And Mr. Walton's – What action was taken against her? With respect to the leak? None. Ms. Brown was suspended for five days and allowed to use her accrued leave for that suspension for her participation in the changing of the passpoint. And I know that the plaintiffs repeatedly state that there were no rules violated and technically – absolutely not. The City of Tacoma's civil service system is governed by law. One of our laws requires us to maintain that process impartially. There was no question that Mr. Knutson had Ms. Brown reset the passpoint on a competitive civil service exam for the express purpose of allowing a candidate who had previously failed the exam to survive the process. It's correct, isn't it, that between the Fish allegation and the later allegation, the second one about intervening in a personnel matter? Yes. That a citizen activist named Eberhardt met with the mayor, and the mayor said to her, people are out to get Knutson? Yes, and – Can you start with a yes or no? Yes. That did happen. That is Ms. Eberhardt's testimony. Okay. And Ms. Eberhardt, in her testimony, could not articulate who the people were. What Mr. Barsma – what Mayor Barsma testified to was, I believe, that he met with Ms. Eberhardt, and he felt that that council member Phelps and perhaps Talbert – and it's a voluminous record, Your Honor, I apologize – were less than favorable to Mr. Knutson, certainly. And the record also reflects that their concerns and complaints about his performance long predated any of the events in April of 2003. Did the mayor and the city council have the authority to terminate the city manager? Yes. For any reason? Yes. Including no reason at all? Exactly. It requires a vote of five council members. They're his direct supervisors. And they – he is the only employee that the city council has. They have, under our charter, no authority to undertake any activity with respect to any of the city manager's subordinates. And there's no question that the mayor and the city council members involved denied the content of this April meeting where Knutson and Brown claim they were told that actions should be taken against the chief. I don't know that there's any testimony as to what the mayor said. The only people at that meeting were Mary Brown, Philip Knutson, Robin Jenkinson, and Elizabeth Pauley. So anything that anybody else said – for example, Mr. Phelps publicly stated, I think somebody's lying. And I've known Robin Jenkinson for many, many years. And I find her to have the utmost integrity. By that, he certainly implied that he found Ms. Jenkinson's version of the events more credible. But this is about whether or not James Walton fired Mr. Knutson because of the stance he took on that April 25th meeting. Somewhere in here, the – in these events, the then city manager was fired, right? Not Woodson, but his – Mr. Korpis was the preceding city manager. He was actually out of the city within a very short time period after the city shooting. He was out in May of 2003, and that's when Mr. Walton was appointed interim city manager. He had been – By the city council. Yes. He had been deputy city manager in conjunction with Mr. Korpis. And then Mr. Korpis's employment was terminated in July of 2003, and Mr. Walton was – his title was changed from interim to permanent city manager. When was the Brame settlement entered into? June 10, 2003, right? No. Oh, no. The Brame – That's when it was filed. The Brame claim for damages, I don't recall exactly when it was filed. We had a couple of them, and then there was some lapse of time. When was it settled? I want to say last year. I'm not sure that there's anything in the record that speaks to that, and I am doing that from memory, but I believe it was last year. Ms. Holman, you characterized the alteration of the test point as a violation of the city rule. Yes. Is that a characterization that your office provided to Mr. Walton at the time? Was he advised that it was the view of the city attorney that Mr. Knutson had violated a rule? Your Honor, I don't believe there's anything in the record to that. I will tell you that there is testimony in the record that in conjunction with the passpoint investigation, Mr. Walton was provided legal counsel from the city attorney's office. I see. And really – The same office that was denying the content of the April meeting. Yes, but it did not involve any of the participants of that meeting. Specifically, I, as Ms. Jenkinson was testified to and is contained in the record, I was sent to provide Mr. Walton assistance because I had no involvement with any of that. My role in the city attorney's office is limited solely to litigation. Is Ms. Jenkinson your boss? She is. The city manager based his decision to fire Mr. Knutson on two intervening and wholly unrelated events. Mr. Knutson was the city official charged with protecting the integrity of the city's hiring processes. And this is happening in a time period where the city of Tacoma is under tremendous criticism for the hiring processes that were employed with David Brame. And in his capacity as city manager, the city manager learns of not one, but two separate instances where Mr. Knutson was trying to manipulate the hiring process to his own ends. The first one was brought to his attention in September. He immediately tried to retain Pierce County to investigate it. They began a preliminary investigation and determined that the scope of this was well beyond anything that they could handle. So he hired the Washington law firm to conduct an independent investigation. In September, Mr. Armfield comes forward and indicates that Mr. Knutson tried to enlist his aid in manipulating a process to ensure that a candidate didn't survive it. At that point, the city manager has two credible and serious allegations of misconduct against his HR director. He put him out on admin leave. He hired – actually, he didn't. He tasked the city hearing examiner. He took a totally hands-off approach and said to the city hearing examiner, I want you to hire outside investigator. I want you to look into this. I want you to screen me, and I want you to report directly to the city council. The investigator was from Sebris-Brusto. And she came back and said, yes, he tried to pack the panel to ensure that a candidate didn't make it. The HR director inappropriately manipulated the hiring process. The city manager gets to say that that's not okay. And there is no evidence, no evidence to conclude or suggest that that decision was based on anything other than – no competent evidence to suggest that that decision was based on anything other than my HR director doesn't get to manipulate my process. All right. Thank you, counsel. The case of Knutson v. Tacoma will be submitted. And this session of the court for today is adjourned. All rise. The court for this session has adjourned.
judges: Hawkins, Wardlaw, Pollak